MINNKOTA POWER COOPERATIVE, INC., a corporation, Plaintiff and Appellee,

v.

LAKE SHURE PROPERTIES, a partnership, and Fred Selberg and LaVonne Selberg, Defendants and Appellants.

Civ. 9738–A.

Supreme Court of North Dakota.

July 17, 1980.

Conmy, Feste & Bossart, Fargo, for defendants and appellants; argued by David R. Bossart, Fargo.

Vogel, Brantner, Kelly, Knutson, Weir & Bye, Fargo, for plaintiff and appellee; argued by John D. Kelly, Fargo.

PAULSON, Justice.

This appeal is the sequel to *Minnkota Power Coop. v. Lake Shure Prop.*, 289 N.W.2d 230 (N.D.1980). The reader of this

opinion may consult such previous opinion for additional background and factual material. Several issues have been presented for review. The essential question is whether or not the Cass County District Court erred in finding that Minnkota could uprate its 230–kilovolt Center-Fargo transmission line to a 345–kilovolt line within the scope of certain easements which Minnkota had obtained from the Landowners in 1968 and 1969. We affirm the judgment of the district court which permanently and forever enjoined the Landowners from prohibiting, interfering with, or restricting Minnkota's entry into the Landowners' property for modification and uprating of electric transmission lines.

The first issue presented is whether or not it was proper for the district court to "reinstate" its December 17, 1979, judgment. Although we believe the choice of the word "reinstate" was a poor one, we also believe that it was proper under the facts of this case to incorporate the December 17, 1979, judgment into the May 21, 1980, judgment.

In our previous opinion, we found that the 20–day notice requirement for Public Service Commission hearings set out in § 49–22–13 of the North Dakota Century Code applied to waiver hearings and we remanded to the district court with instructions "permitting Minnkota to make application to the PSC for a new hearing on Minnkota's application for a certificate of site compatibility". *Minnkota, supra,* 289 N.W.2d at 234. We there said in 289 N.W.2d at 231:

> "*We do not reach the merits of this appeal* because of what we deem to be an insufficiency in the notice given to the Landowners by the Public Service Commission [PSC] of a hearing on waiver of all corridor and routing procedures. *We reverse and remand to the district court with instructions.*" [Emphasis added.]

Upon remand, Minnkota applied for a new certificate of site compatibility and a hearing was held before the PSC on April 9, 1980. The PSC granted Minnkota's application on May 8, 1980. On May 9, 1980,

Minnkota made a motion for reinstatement of the original December 17, 1979, judgment. The district court granted this motion and issued its findings of fact, conclusions of law, order for reinstatement of judgment, and judgment on May 21, 1980.

In its May 21, 1980, findings of fact the district court found that:

> "X. . . . The Supreme Court after determining that notice requirements for the PSC hearing had not been met, *declined to rule on the merits of the case.* . . ." [Emphasis added.]

and also found that:

> "XII. The merits of this lawsuit have been previously tried to this Court on October 16 and 17, 1979, with evidence presented by all parties. *This Court's earlier decision on the merits is not inconsistent with the mandate of the Supreme Court,* and the previous judgment of this Court is entitled to reinstatement." [Emphasis added.]

Counsel for the Landowners argues that our reversal on the first appeal renders the original judgment a nullity and that it was, therefore, improper to reinstate the first judgment. We disagree.

■ We conclude that where an appellate court reverses a judgment of the district court and remands to the district court, the district court must comply with the mandate of the appellate court's opinion. We believe the district court did so in this case. Our reversal was a qualified one, and we expressly reserved judgment on the merits in the opinion. Therefore, it was not inconsistent with our opinion for the district court to incorporate its pre-remand judgment into its post-remand judgment. Principles of judicial convenience and economy as well as considerable case law support this proposition.

■ In *Kern v. Kelner,* 75 N.D. 703, 32 N.W.2d 169 (1948), at paragraphs 1 and 2 of the syllabus, this court held:

> "1. When the judgment of the district court is reversed and the Supreme Court remands the case for further proceedings in conformity with law, *it is the duty of the district court to examine the opinion*

*of the Supreme Court transmitted with the remittitur [NDRC 1943, 28–2730) and to determine from what is there said and the nature of the case what further proceedings may properly be had in the action, consistent with the decision and order of the Supreme Court and in conformity with law.*

"2. Ordinarily, when a judgment is reversed and the case remanded generally for further proceedings in conformity with law, and the opinion of the appellate court shows that the controversy has not been finally disposed of, the court below is free to make any order or direction in the further progress of the case not inconsistent with the decision and opinion of the appellate court, and conformable to law and justice." [Emphasis added.]

In *Bjerken v. Ames Sand and Gravel Company,* 206 N.W.2d 884 (N.D.1973), we distinguished, at page 888, that portion of the *Kern* opinion which held that a trial court has liberal discretion in post-remand proceedings. The approach suggested by the Landowners in the instant case is that, when a judgment is reversed, everything upon which that judgment is based is null and void. We might be inclined to agree where there is an unqualified reversal of a judgment. But to require a new trial based on a qualified reversal which gives specific instructions for the district court to follow would be contrary to the principles of fairness, judicial economy, and convenience, and inconsistent with the established case law in the area. When the mandate of the appellate court makes clear the defects which need to be cured by the district court, the district court need do no more than rectify those defects and proceed in a manner consistent with the appellate opinion. It would be an exercise in futility to require the parties to go back and retry the entire case where it is not necessary to do so to resolve the problems noted in the remanding appeal. In *Dobler v. Malloy,* 214 N.W.2d 510 (N.D.1973), we cited *Kern v. Kelner,* 75 N.D. 703, 32 N.W.2d 169 (1948), for the proposition that the district court upon remand has a duty to examine the opinion of the Supreme Court and to determine from it what further proceedings may properly be had in the action consistent with the decision of the Supreme Court. *Dobler, supra,* 214 N.W.2d at 513. In the instant case, the district court did examine our opinion and in compliance therewith permitted Minnkota to apply for a valid hearing with the PSC. Minnkota did so and the notice requirements were met. The court was not required to have a new trial of issues which had already been litigated before it.

We quote with approval the following language used by the Michigan Court of Appeals in *Taines v. Munson,* 42 Mich.App. 256, 201 N.W.2d 685, 687–688 (1972):

"While it is true that in the prior case, defendants did argue that the individual plaintiffs were not real parties in interest, and while it is true that this Court made no comment on that argument, we do not agree that this constitutes *res judicata.* While we can find no Michigan cases directly on point, we believe the better rule was announced by the Sixth Circuit in *D'Arcy v. Jackson Cushion Spring Co.,* 212 F. 889, 891–892 (C.A.6, 1914):

" '[E]very question properly involved upon the appeal, which is determined by the appellate court and constitutes, in part at least, the basis for its conclusion upon the ultimate question presented, becomes a part of the law of the case controlling the lower court in its subsequent proceedings.'

The necessary corollary of this rule is that a question which was not determined by the appellate court, or does not constitute the basis for its conclusion upon the ultimate question presented, is not a part of the law of the case, and does not control the lower court in its subsequent proceedings. To straitjacket proceedings subsequent to a decision on a case by an appellate court by making assumptions regarding the disposition of arguments which the appellate court did not see fit to consider, is not, in our opinion, the wisest of policies."

For the effect of an opinion which orders "judgment reversed" and nothing more, *see Tucson Gas & Electric Company v. Superior Court*, 9 Ariz.App. 210, 450 P.2d 722 (1969); *Hunter v. Hunter*, 156 Ind.App. 187, 295 N.E.2d 834 (1973).

Nothing in our previous opinion indicates that the trial court's decision on the merits was in error. Therefore, it was not inconsistent with that prior opinion for the trial court to "reinstate" its judgment as to the merits. The instant case is again before this court because we granted a motion to expedite the appeal. At oral argument both sides indicated their desire that this court decide this case on its merits.

■ Upon remand, the Landowners received actual notice of the April 9, 1980, PSC hearing by certified mail. In addition, the PSC complied with the statutory notice requirements of § 49–22–13, N.D.C.C. Because the Landowners received actual notice of the PSC hearing, they do not have standing to challenge the constitutionality of the notice provisions of § 49–22–13, N.D. C.C. *See State v. Gamble Skogmo, Inc.*, 144 N.W.2d 749, 769 (N.D.1966) ("a litigant may assert only his own constitutional rights or immunities").

The Landowners filed a counterclaim for damages, which claim was severed by the district court pursuant to Rule 42(b) of the North Dakota Rules of Civil Procedure. The question of damages, therefore, has not been made a part of the record and is not involved in this appeal.[1] We now proceed to a discussion of the merits of this case.

■ The Landowners assert that the district court erred in failing to take into consideration the impact the proposed uprating of Minnkota's high voltage transmission line would have on the value of the Lake Shure property and its potential use for residential development. At the time Minnkota obtained the easements, the Lake Shure property was agricultural. Since that time the property has been platted for residential development. The district court found that

"XVI. The biological effects of the increased voltage to be transmitted by Minnkota are inconclusive and will have a minimal disruptive or adverse effect upon the defendants."

Our review of a finding of fact of a district court is limited by the "clearly erroneous" principle of Rule 52(a), N.D.R.Civ.P. A finding is clearly erroneous when we are left with a "definite and firm conviction that a mistake has been made". *Nastrom v. Nastrom*, 284 N.W.2d 576, 580 (N.D.1979).

■ In its memorandum opinion, the district court indicated that the proposed uprating of the line will not interfere with the agricultural use of the premises. The Landowners argue that this completely ignores the adverse effect of the uprating on the value of the property and its use for residential development. The Landowners presented testimony on the economic impact of the uprating of the line. This evidence relates more to the question of damages, which has not been presented here, than to the question of the scope of the easements. Therefore, the question of adverse biological and economic effects of the uprating is relevant to this appeal only for the purpose of determining whether or not there has been a significant increase in the burden on the servient estates pursuant to the terms of the easements.

The increase in the burden is really only one of degree. The towers supporting the line are to be raised seven feet and the power in the line is to be increased from 230 kv to 345 kv. The PSC required that the Landowners are to be compensated for all damage to their property caused by construction involved in the uprating. The PSC has also required that Minnkota take steps to mitigate any increases in radio and television interference. The record supports the trial court's finding that the biological effects of the increase in voltage will be minimal.

The easements in this case are general ones, authorizing Minnkota to "place, construct, operate, repair, maintain, and re-

---

1. Neither party objected to the severance of the issue of damages.

place thereon . . . an electric transmission line or system, including all necessary fixtures in connection therewith . . . ." The original grants said nothing about the maximum amount of voltage the line would carry.

Section 47–05–07, N.D.C.C., requires that the extent of an easement is to be determined by "the terms of the grant or the nature of the enjoyment by which it was acquired". The Landowners have argued that Minnkota, by constructing a 230–kv line initially is limited to that use. Such a position is untenable and the trial court was correct in its decision that the extent of an express easement must be determined by the terms of the grant.[2]

Under the terms of the grant, Minnkota could have constructed towers seven feet taller and put 345 kilovolts through the line rather than 230 kilovolts at the time it originally built the transmission line. At the time the easements were granted the Landowners could have made reservations regarding the capacity of the line or its voltage. No such reservations were made. We believe that the rights granted to Minnkota under the easements include the right to uprate the line to a reasonable degree. The question of the reasonableness of the degree of uprating under the existing easements is a question of fact. In the instant case, we believe that the district court was not "clearly erroneous" in its determination that the proposed uprating project was reasonable and within the scope of the easements.

The Landowners argue that such a finding could result in power companies gradually increasing or bumping up the power through a transmission line one step at a time. We disagree because each increase in power must relate back to the time and terms of the original easement. Therefore, the reasonableness of any increase is balanced against the permissible scope of the original easement.

In *Talty v. Commonwealth Edison Company*, 38 Ill.App.3d 277, 347 N.E.2d 74 (1976), the Court of Appeals for the Third District of Illinois was presented with the question of whether or not a utility company could uprate a 220–kv line to a 345–kv line under existing easements. The easements were general, as in the instant case. Also similar to the instant case, the uprating would require a change in the structure of the support towers. The landowners in *Talty* argued that the increased voltage and changes in the towers imposed an unreasonable burden on the servient estate and one not contemplated by the parties at the time of the original grant. The Illinois Court found in favor of the utility company and rejected the landowners' arguments, saying, in *Talty, supra,* 347 N.E.2d at 76:

> "Certainly the initial use (construction of a 220KV line) does not indicate any intention to limit the easement to lines of that size since there was no ambiguity in the grant itself. *Weaver v. Natural Gas Pipeline Co., supra.* There was no limitation in the easement on the size or the number of the electric transmission lines to be installed which was not difficult to do if the parties had any such intention.

The *Talty* court cited *Weaver v. Natural Gas Pipeline Co.,* 27 Ill.2d 48, 188 N.E.2d 18 (1963), where an existing 4–inch gas pipeline was replaced with a 10–inch line and no increased burden on the servient estate was found.

An Annotation found at 3 A.L.R.3d 1256 (1965) discusses the question of the reasonableness of use under easements granted in general terms. It is there said, at page 1260:

> "The most comprehensive restriction that is imposed upon the use of a general right of way by the dominant owner is that he may not so use the way as to unduly increase the burden upon the ser-

---

**2.** However, it may be necessary for the court to look at custom and usage to determine what was meant by the general terms used in the easement at the time it was executed. In the instant case no evidence of the effect of custom and usage on the terms of these easements was introduced and it would be inappropriate to apply the doctrine of custom and usage here. *See Peterson v. McCarney,* 254 N.W.2d 438, 443–444 (N.D.1977).

vient tenement. Thus, the rule that the right of way cannot be used to burden the servient tenement to an extent greater than was contemplated at the time of the grant has been applied as a test in determining the reasonableness of particular uses, both in terms of their extent and their manner."

The Annotation indicates that the easement may be used by the dominant owner in availing himself of all modern inventions and all improvements. 3 A.L.R.3d at 1260 (1965). The only limitation on such improvements is that they be reasonably necessary and consistent with the purpose for which the easement was granted. *Wall v. Rudolph*, 198 Cal.App.2d 684, 18 Cal.Rptr. 123 (1961).

▬ In the instant case we believe the uprating of the line is consistent with the purpose (to transmit electricity) for which the easements were granted and it is reasonably necessary for Minnkota to uprate existing transmission lines rather than be forced to construct a new line to transmit additional energy from the Coyote Power Plant to the Fargo area. As previously indicated, we reserve comment on how the above issues relate to the question of compensation to the individual Landowners because the issue of damages was severed by the trial court, pending the outcome of this appeal regarding the scope of the easements.

The May 21, 1980, judgment of the Cass County District Court permanently and forever enjoining the Landowners from prohibiting, interfering with, or restricting Minnkota's entry onto the Landowners' property for modification and uprating of electric transmission lines is affirmed.

ERICKSTAD, C. J., and PEDERSON, VANDE WALLE and SAND, JJ., concur.