**MINNKOTA POWER COOPERATIVE, INC., a corporation, Plaintiff and Appellee,**

v.

**LAKE SHURE PROPERTIES, a partnership, and Fred Selberg and LaVonne Selberg, Defendants and Appellants.**

Civ. No. 9738.

Supreme Court of North Dakota.

Feb. 21, 1980.

Rehearing Denied March 13, 1980.

Conmy, Feste & Bossart, Ltd., Fargo, for defendants and appellants; argued by David R. Bossart, Fargo.

Vogel, Brantner, Kelly, Knutson, Weir & Byè, Ltd., Fargo, for plaintiff and appellee; argued by John D. Kelly, Fargo.

PAULSON, Justice.

This is an appeal from a December 17, 1979, judgment of the Cass County District Court enjoining Lake Shure Properties and Fred Selberg and LaVonne Selberg [hereinafter the Landowners] from prohibiting, interfering with, or restricting entry of Minnkota Power Cooperative, Inc. [hereinafter Minnkota] on to the Landowners' properties for the purpose of modification and uprating of electric transmission lines. We do not reach the merits of this appeal because of what we deem to be an insufficiency in the notice given to the Landowners by the Public Service Commission [PSC] of a hearing on waiver of all corridor and routing procedures. We reverse and remand to the district court with instructions.

Minnkota is an electrical utility cooperative in the business of wholesaling electrical energy in northern North Dakota and Minnesota with its headquarters in Grand Forks, North Dakota. In 1968 and 1969, Minnkota obtained easements for the construction of its Center-Fargo transmission line. The Center-Fargo transmission line

extends approximately 210 miles from a power generating plant in Center, North Dakota, to the Maple River Substation north of Fargo, North Dakota.

Prior to construction of the Center-Fargo line, Minnkota obtained identical written easements from Lake Shure and the Selbergs, which easements granted Minnkota permission to enter upon the Landowners' property to "construct, operate, repair, maintain, and replace thereon" an electric transmission line. The easements identify the location of the center line of the energy corridor and extend 60 feet in each direction from the center line of the towers supporting the transmission line. Three towers were placed on the Selberg property and three on the Lake Shure property, for which the Landowners were paid $275.00 per tower.

Due to increased demand for electrical energy, Minnkota entered into a joint venture with four other power companies to construct the 440 megawatt Coyote Power Plant at Beulah, North Dakota. In order to transmit its share of the power from the Coyote Power Plant to its service area, Minnkota had to seek additional transmission facilities. Minnkota determined that the most efficient and economical approach would be to uprate its existing Center-Fargo line from 230 kilovolts to 345 kilovolts. The primary advantage of the uprating project was considered to be the fact that Minnkota could use its existing rights-of-way along the Center-Fargo line to transmit the additional energy rather than the more burdensome alternative of constructing a new and separate transmission corridor across the State.

The actual uprating of the line was to be done by replacing the bottom section of each existing tower with a bottom section seven feet longer. This was to be performed by lifting each tower with a mobile crane and replacing the bottom leg section. This can even be done with the line energized, although whenever possible the work is performed with the line de-energized. After the bottom leg section is replaced, the upper sections of each tower are reinforced and additional conductors and insulators are installed to accommodate the additional line.

Minnkota sought to obtain a waiver of all corridor and routing procedures pursuant to § 49-22-07.2 of the North Dakota Century Code, which, at the time this cause of action arose, provided:

"*49-22-07.2. Waiver of procedures and time schedules.*—Any utility which proposes to construct an energy conversion facility with a design not in excess of one hundred thousand kilowatts or a transmission facility within the state may make an application to the commission for a waiver of any of the procedures set forth in this chapter. The commission, after hearing and upon a finding that the proposed facility is of such length, design, location, or purpose that it will produce minimal adverse effects, may issue an order waiving specified procedures and time schedules required by this chapter, including but not limited to applications, notices, and hearings, and may forthwith issue a certificate of site compatibility, a route permit, or both, with such conditions as the commission may require. The proposed facility shall thereafter be constructed, operated, and maintained in compliance with this chapter."

The waiver hearing was held on June 20, 1978, at Bismarck, North Dakota. Notice of the hearing on Minnkota's application for a waiver of all corridor and routing procedures was published in The Fargo Forum on June 9, 1978, or 11 days prior to the hearing in Bismarck.

The Landowners contend that this notice was defective because it did not comply with the requirements of § 49-22-13, N.D.C.C., which, at the time this cause of action arose, provided:

"*49-22-13. Public hearings—Notice.*— The commission shall hold public hearings as prescribed by regulation to afford interested persons an opportunity to be heard regarding its inventory of exclusion and avoidance areas and any other aspects of the commission's activities, duties, or policies arising under or set

forth in this chapter. The commission shall hold at least one public hearing in each county where a site or corridor is being considered for designation pursuant to section 49–22–10 as suitable for construction of an energy conversion facility or transmission facility; however, where more than one county is involved, the commission may consolidate the county hearings and hold a consolidated hearing or hearings in a place designated by the commission. Notice of public hearings shall be given by the commission at the expense of the applicant at least twenty days prior to such hearings. In an emergency, the commission, in its discretion, may notice a hearing upon less than twenty days. Notice shall be by publication in the official county newspaper of the county in which the public hearing is to be held and by mailed notice to the persons designated in subsection 2 of section 49–22–08."

We agree. Section 49–22–13, N.D.C.C., provided that notice by publication of a public hearing of the PSC was to be made at least 20 days prior to the time when the hearing is held. It is conceded by counsel for Minnkota that publication was not made at least 20 days prior to the hearing.

■ Counsel for Minnkota argues, however, that the 20-day requirement does not apply to waiver hearings. We find that it does. We believe that waiver hearings are implicitly included in the words "any other aspects of the commission's activities, duties or policies arising under or set forth in this chapter" used in § 49–22–13, N.D.C.C. In fact, we believe that the above-quoted phrase was intended by the Legislature to be tantamount to an incorporation by reference of a section such as § 49–22–07.2, N.D.C.C. Further support for our position that the 20-day notice requirement applies to waiver hearings is found in § 69–06–01–02(3) of the Regulations of the Public Service Commission. PSC Reg., section 69–06–01–02(3) of the North Dakota Administrative Code provided, at the time this cause of action arose, that:

"3. WAIVER AND EMERGENCY HEARINGS. Public hearings shall be held on an application for a waiver of procedures and time schedules and on a request for a determination of demonstrable emergency. Notice of a hearing shall be given by the commission at least twenty days prior to the hearing by publication in the official newspaper of each county in which any part of the facility is proposed to be located."

Minnkota cites *Eckre v. Public Service Commission*, 247 N.W.2d 656 (N.D.1976), for the proposition that the determination of who should receive notice is in the discretion of the PSC. That is a correct reading of *Eckre* in cases where no specific procedure is contained in the statute; however, as we have indicated above, we find that § 49–22–13, N.D.C.C., is sufficiently specific to require 20 days' notice of a waiver hearing.

■ Minnkota's argument that the PSC has discretion under § 49–22–13, N.D.C.C., to shorten the notice period is unpersuasive. It is true that the statute provides for notice of less than 20 days when the PSC determines that there is an emergency. However, there is nothing in the record which indicates that an emergency existed or that the PSC exercised its discretion. We find it to be a manifest abuse of discretion for the PSC to notice a hearing only 11 days prior to the actual hearing date where no emergency exists and the applicable statutes and regulations require a minimum of 20 days' notice.

Because our decision that noncompliance with § 49–22–13, N.D.C.C., requires a remand, we find it unwise and unnecessary to address the Landowners' constitutional argument that notice by publication constitutes a denial of due process of law. It is also unnecessary for us to address the issues regarding construction of the easements and environmental effects of the uprating at this time because the procedural issues are dispositive of this case.

■ Minnkota contends that the actions of the PSC are not subject to collateral attack in this proceeding by the Landowners. The PSC issued a certificate of site

compatibility and order waiving all procedures and time schedules after the June 20, 1978, hearing. As discussed previously, that hearing was based on insufficient notice. Consequently, the Landowners were never made a party to that proceeding. Minnkota argues that the Landowners should have appealed the defective notice in the Burleigh County District Court, pursuant to the provisions of the Administrative Agencies Practice Act, Chapter 28–32, N.D. C.C. Such a construction would create a situation in which the Landowners would be required to appeal from a decision to which they were never made a party. Since they were never made a party to the waiver proceeding, they would have no standing to appeal that decision as a "party to a proceeding held by an administrative agency" required by § 28–32–15, N.D.C.C. Were we to hold that the Landowners could not collaterally attack that proceeding now, we would be permitting a forfeiture of their rights without allowing them their day in court.

Under the guise of the authority of the certificate of site compatibility granted Minnkota by the PSC, Minnkota attempted to enter onto the Landowners' property in May of 1979, to begin uprating of the transmission line. The Landowners refused to permit such entry. Minnkota then brought an action in June of 1979, asking the district court to enjoin the Landowners from preventing Minnkota's entry on the property for purposes of uprating the line. Under these circumstances, Minnkota is not entitled to an injunction.

An order of an administrative agency can be collaterally attacked if it is based on a jurisdictional defect appearing on the face of the record. See *Martin v. Wolfson, et al.,* 218 Minn. 557, 16 N.W.2d 884, 888 (1944). Where the record indicates, as it does here, that statutory notice requirements were not complied with by an administrative agency, an order based on findings made as the result of a hearing based on defective notice is subject to collateral attack. Similarly, we have held that a judgment of a court based on lack of·

jurisdiction is subject to collateral attack. *Farrington v. Swenson,* 210 N.W.2d 82 (N.D.1973). Certainly, a logical extension of the same rule requires its application to administrative orders.

The judgment of the district court is reversed, the injunction is dissolved, and the case is remanded to the Cass County District Court with instructions permitting Minnkota to make application to the PSC for a new hearing on Minnkota's application for a certificate of site compatibility.

ERICKSTAD, C. J., and VANDE WALLE and SAND, JJ., concur.

PEDERSON, Justice, concurring in part and dissenting in part.

I agree that Minnkota is not entitled to an injunction. That does not mean that, under a different set of circumstances, a collateral attack against a PSC certificate would be permitted.

I do not agree that we should not decide the merits of the questions relating to the rights and obligations under the easement previously granted to Minnkota by the Landowners. This is an action for a declaratory judgment with an incidental prayer for injunctive relief. The trial court heard all of the evidence offered and the arguments made on the question, and concluded that the proposed changes in the transmission line would not result in a greater burden upon the servient estate than was originally contemplated by the parties.

It may be interpreted that the failure of the majority to affirm the trial court's declaration of rights under the easement means that the question was incorrectly answered or that it should be retried. In my opinion, both of those interpretations would be wrong.